# UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF LOUISIANA

# SHREVEPORT DIVISION

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

OCT 1 6 2013

TONY R. MOORE, CLERK
BY_____ DEPUTY

ALOYSIUS GRAHAM, individually and
on behalf of others similarly situated

CIVIL ACTION NO. 5:13-cv-1571

versus

JUDGE TOM STAGG

CHESAPEAKE LOUISIANA, L.P. AND
CHESAPEAKE OPERATING, INC.

## MEMORANDUM RULING

Before the court are two motions: a motion for sanctions filed by the

defendants, Chesapeake Louisiana, L.P. and Chesapeake Operating, Inc. (hereinafter

collectively referred to as "Chesapeake"), pursuant to Rule 11 of the Federal Rules

of Civil Procedure, and a motion for summary judgment filed by Chesapeake,

pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Record Documents

8 and 9. For the reasons set forth below, Chesapeake's motion for summary judgment

is **GRANTED** and Chesapeake's motion for sanctions is **DENIED AS MOOT**.

## I. BACKGROUND AND PROCEDURAL HISTORY

This contentious dispute arises out of the early days of the discovery of the

highly productive Haynesville Shale deposit underlying areas of Northeast Louisiana

and East Texas. In the summer of 2008, neighboring landowners would organize

themselves into groups to collectively negotiate mineral leases with energy companies with the hope that joining together would allow the group to obtain higher bonuses and royalty amounts as well as lessor-friendly lease provisions. Plaintiff Aloysius Graham ("Al Graham" or "plaintiff") joined a group called the Graham Group. To enhance its bargaining position, the Graham Group merged with another group of landowners called the Go-Getters Group.[1] The leaders of the Group included Jerry Cook and Maurice Graham.

On July 8, 2008, Chesapeake agent James Reynolds ("Reynolds") emailed Maurice Graham a draft Agreement to Lease ("Agreement") and lease form ("Chesapeake lease form") offering a $16,500 per acre bonus, twenty-seven percent royalty, and three-year term with a two-year optional extension. The Agreement contained the following relevant provision: "Chesapeake's offer is subject to the *execution* of a mutually agreed upon paid up form of Oil and Gas Lease, in the form as attached herein as Exhibit 'A'." Record Document 9, Ex. 3 (emphasis added).

On September 8, 2008, Chesapeake agent Joey Kovach ("Kovach") emailed Maurice Graham a draft Letter of Intent ("LOI") with nearly identical language to the Agreement and another copy of the Chesapeake lease form. See id., Exs. 4 and 5.

---

[1] The two groups will be collectively referred to in this memorandum ruling as "the Group."

Chesapeake's offer was now a $20,000 per acre bonus, twenty-five percent royalty, and three-year term. The LOI contained a provision identical to that in the Agreement, making Chesapeake's offer conditional on the execution of a mutually agreed lease form. See id., Ex. 5.

Two days later, on September 10, Maurice Graham emailed Kovach to inform him that the Group hired an attorney, Amos "Lang" Wedgeworth ("Wedgeworth"), to negotiate the terms of the lease with Chesapeake. See id., Ex. 5. Wedgeworth sent an email to Kovach and Reynolds on September 10 with an alternative lease form ("Wedgeworth lease form") that was used in a prior agreement between Chesapeake and another group of landowners, the Greenwood Group. See id., Ex. 6. Wedgeworth proposed this lease form be used between Chesapeake and the Group. See id.

On September 15, Wedgeworth emailed Kovach and Reynolds proposed revisions to the LOI. One revision altered the aforementioned provision to read, "Chesapeake's offer is subject to the execution of a mutually agreed upon paid up form of Oil and Gas Lease." Id., Ex. 7. Wedgeworth also emailed Maurice Graham and pointed out this revision to the LOI, advising him that the Group should not agree to the Chesapeake lease form. Maurice Graham replied the same day, stating the revised LOI "look[ed] excellent. That is something we can work with." Id., Ex. 8.

3

Effectively, Wedgeworth's revision made the LOI conditional on Chesapeake and the Group executing any agreed upon lease form, rather than requiring the Group to accept the Chesapeake lease form.  On September 16, 2008, the revised LOI was signed by members of the Group, including the plaintiff, and by Kovach on behalf of Chesapeake.  See Record Document 28, Ex. A.

At the time the LOI was signed, no lease form had been executed between Chesapeake and the Group.[2]  Wedgeworth emailed Kovach and Reynolds on October 8, 2008, asking if Chesapeake had finalized its response to the Wedgeworth lease form.  See Record Document 9, Ex. 12.  Kovach replied and told Wedgeworth that he had sent the form to Chesapeake's legal department for approval and that he would check its status.  See id.  Wedgeworth emailed Kovach and Reynolds again on October 15, 2008, asking if Chesapeake had any proposed revisions to the Wedgeworth lease form and when Chesapeake anticipated closing on the leases.  See id., Ex. 13.

On October 17, 2008, Kovach met with Maurice Graham, Jerry Cook, John

---

[2] Plaintiff alleges that, earlier the same day, Kovach spoke with Jerry Cook and Maurice Graham on the phone and told them that Chesapeake would agree to use the Wedgeworth lease form.  See Record Document 28, Ex. T, Maurice Graham affidavit at ¶ 11; Jerry Cook affidavit at ¶¶ 6-7.  However, there is no evidence in the record that would indicate this lease form or any other was actually executed between Chesapeake and the Group anytime prior to Chesapeake withdrawing its offer on October 17, 2008.

Hamm, and Dewayne Graham. See Record Document 28, Ex. AA, Deposition of Maurice Graham at 6-7. At this meeting, Kovach told them that Chesapeake was withdrawing its lease offer. See id. Ex. AA at 16-17. Additionally, Kovach handed them a written withdrawal that was not on letterhead, not dated, and not signed.[3] See Record Document 9, Ex. 17. At a subsequent meeting that morning between Kovach, Maurice Graham, Dewayne Graham, and Wedgeworth, Kovach reiterated that Chesapeake was withdrawing its offer to lease. See Record Document 28, Ex. AA, Deposition of Maurice Graham at 24.

Prior to the instant suit, two lawsuits were filed against Chesapeake with regard to the LOI that had been signed with the Group. First, a member of the Go-Getters Group, Judy Thomas, brought a putative class action against Chesapeake in Louisiana

---

[3] The withdrawal read as follows:

Reference is hereby made to that certain **Agreement to Lease**, dated September 16, 2008, by and between Chesapeake Louisiana, L.P. (CHK) and those certain signing Parties known collectively as the Keithville Group and the GoGetters Group.

Please be advised that after careful examination of the form of Mineral Lease and Rider provided to CHK in connection with said Agreement, CHK must reject your proposed form. Further, given the state of the economy and dramatically reduced gas prices and lease values, we do not believe we could agree on a mutually acceptable form of lease at this time. Therefore, CHK must, regretfully, withdraw its offer to lease as outlined in said Agreement.

state court, which was removed to federal court.  See Thomas v. Chesapeake La., L.P., No. 09-0888 (W.D. La. 2010).  Once class certification was denied, Judy Thomas voluntarily dismissed the suit on June 22, 2010.  Second, another member of the Go-Getters Group, Floyd Walsworth, Jr. ("Walsworth"), sued Chesapeake in Louisiana state court.  See Walsworth v. Chesapeake La. L.P., No. 544,902 (1st Judicial District Court, Caddo Parish).  The trial court granted Chesapeake's motion for summary judgment, finding that "the executed Agreement To Lease did not result in a binding agreement specifically because the **undisputed facts** indicated that the parties understood that their Agreement To Lease was tantamount to a letter of intent which contemplated additional negotiations, to wit: finalizing the lease form." Record Document 9, Ex. 2 (emphasis in original).  Walsworth's remaining claims were ultimately dismissed after the Louisiana Second Circuit Court of Appeal found those claims were "subsumed" by the trial court's finding that the executed LOI "did not result in a binding agreement between the parties."  Id., Ex. 16.  That ruling is presently on appeal.

On May 28, 2013, plaintiff, Al Graham, filed the instant suit in Louisiana state court.  It was a putative class action on behalf of all persons who signed the revised LOI, raising breach of contract and breach of the duty of good faith actions and seeking damages in the amount of the $20,000 per acre bonus Chesapeake had agreed

to pay. See Record Document 1, Ex. 1. Chesapeake removed the case to federal

court and filed its answer on June 10, 2013. See Record Documents 1 and 2. A

motion to certify the class action was filed on August 14, 2013, but a ruling on that

motion has been deferred until the resolution of Chesapeake's motion for sanctions

and motion for summary judgment. See Record Documents 12 and 18.

Chesapeake filed the instant motions for sanctions and for summary judgment

on August 9, 2013, both on the grounds that there was never a binding agreement to

lease that would support the plaintiff's claims for damages. See Record Documents

8 and 9.[4]

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil

Procedure when "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care

---

[4] In response to the plaintiff' s memorandum in opposition to Chesapeake's
motion for summary judgment, Chesapeake filed a motion to strike the affidavits
of Maurice Graham and Jerry Cook. See Record Document 31. This court is
aware of Rule 56's admonition that only admissible evidence may be considered in
ruling on a summary judgment motion. See Stults v. Conoco, Inc., 76 F.3d 651,
654-55 (5th Cir. 1996). The court--fully cognizant of the evidentiary
standards--will consider the plaintiff's exhibits, giving the statements due weight
and appropriately discounting any improper statements and evidence. Therefore,
Chesapeake's motion to strike is **DENIED** as moot.

Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010).  "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004).   If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial."  Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004).  Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted.  See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). The Fifth Circuit has cautioned that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy" the nonmovant's burden in a motion for summary judgment.  Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).

**B.   Rule 11 Standard.**

Rule 11 of the Federal Rules of Civil Procedure requires attorneys to sign every "pleading, written motion, and other paper" and certify to the court that to the best of their knowledge, formed after a reasonable inquiry, that the claims in the petition

have evidentiary support and are not being used for any improper purpose. Fed. R. Civ. P. 11. Courts are authorized to "impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Fed. R. Civ. P. 11(c)(1); see also Jenkins v. Methodist Hospitals of Dallas, Inc., 478 F.3d 255, 263-64 (5th Cir. 2007). Whether sanctions are appropriate under Rule 11 must be determined using "an objective standard of reasonableness under the circumstances . . . at the time counsel or the party signed the document alleged to be the basis for the Rule 11 violation." Jennings v. Joshua Indep. Sch. Dist., 948 F.2d 194, 197 (5th Cir. 1991).

## C.    Analysis.

### 1.    Breach Of Contract.

The plaintiff argues that Chesapeake is liable under a breach of contract cause of action on two theories: first, that a lease form was approved and thus a binding lease was created, and second, that all suspensive conditions in the revised LOI ought to be deemed approved under Louisiana Civil Code article 1772 and thus the court should find a binding lease was created. In its motions for sanctions and summary judgment, Chesapeake argues that the plaintiff's claims should be dismissed because no binding agreement was ever formed. For the reasons that follow, the court finds that a binding agreement was never formed between Chesapeake and the Group

members, including the plaintiff.  Additionally, the court will not apply Article 1772 to deem that a binding agreement was formed.  Because there was not a binding contract between the parties, Chesapeake cannot have committed a breach.

### a.   The LOI Did Not Form A Binding Contract Between The Parties.

In Louisiana, legislation is superior to all other sources of law.  See La. Civil Code arts. 1, 2, and 3; Doerr v. Mobil Oil Corp., 774 So. 2d 119, 128 (La. 2000). "Therefore, as the solemn expression of the legislative will, if an enactment provides a solution to a particular situation, then no jurisprudence, usage, equity or doctrine can prevail over the legislation."  Duckworth v. La. Farm Bureau Mut. Ins. Co., --- So. 3d ---, No. 11-2835, 2012 WL 5374248 at *6 (La. Nov. 2, 2012).  "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law must be applied as written, and no further interpretation may be made in search of the legislative intent."  Id.

The dispute between the plaintiff and Chesapeake falls squarely within the scope of Louisiana Civil Code article 2670, which states:

> A contract to enter into a lease at a future time is enforceable by either party if there was an agreement as to the thing to be leased and the rent, unless the parties understood that the contract would not be binding until reduced to writing or until its other terms were agreed upon.

The latter part of Article 2670 addresses what are commonly called "letters of intent"

10

or "agreements to agree." When letters of intent contemplate some further conditions

being fulfilled, such as a subsequent written contract being executed, the parties are

not bound, and are therefore free to walk away, until those conditions are satisfied.

See, e.g., Ballard v. XTO Energy, Inc., 784 F. Supp. 2d 635, 640-41 (W.D. La.

2011)(holding no contract was created between the parties because the parties clearly

intended to execute additional documents); ASJ Interests v. Chesapeake La., L.P., No.

11-1343, 2012 WL 2357313 at *6 (W.D. La. June 20, 2012)(holding no contract

existed because the parties intended to execute a final contract but never did);

Liljeberg v. Hosp. Corp. of Am., Nos. 87-4295, 81-4714, and 83-3031, 1989 WL

30272 at *3 (E.D. La. March 28, 1989)(holding no contract existed, in part, because

the parties did not execute further contemplated documents).

The revised LOI that Wedgeworth sent to Chesapeake's agents, which was

ultimately signed by Chesapeake agent Kovach, the plaintiff, and other Group

members, was a letter of intent within the scope of Article 2670. Specifically, the

LOI was "subject to the terms and conditions outlined" therein, one of which was that

"Chesapeake's offer is subject to the execution of a mutually agreed upon paid up

form of Oil and Gas Lease." Record Document 9, Ex. 7. While Chesapeake and the

Group had agreed on many essential terms–$20,000 per acre bonus, three-year lease

term, and a twenty-five percent royalty–a valid lease would not be formed until all of

11

the conditions in the revised LOI were satisfied.  Thus, the revised LOI signed by Chesapeake's agent and the Group members, including the plaintiff, was merely a non-binding letter of intent.

In attempting to contest this point, the plaintiff exclusively cites Chevron U.S.A., Inc. v. Martin Exploration Company, 447 So. 2d 469 (La. 1984). In Chevron, the Louisiana Supreme Court found that a preliminary agreement between the parties created a binding contract.  See id. at 473.  Interestingly, as the plaintiff concedes, Chevron does not discuss, apply, or even mention Article 2670.  Rather, the court reached its conclusion based on language in the contract and the apparent intent of the parties.  See id. at 472-73.  In contrast, the LOI here was expressly "subject to the execution of a mutually agreed upon paid up form of Oil and Gas Lease."  Record Document 9, Ex. 7 (emphasis added).  In fact, Chesapeake and the Group were actually negotiating a mutually agreeable lease form, as evidenced by the emails exchanged between Wedgeworth and Chesapeake's agents.  Even assuming that Kovach gave verbal assurances to Jerry Cook and Maurice Graham that the Wedgeworth lease form was agreeable, neither that lease form nor any other was ever executed by the parties.  Consequently, Chesapeake could not have committed a breach because there was never a binding contract between the parties.

b.    Applying Article 1772 Would Be Inappropriate.

The plaintiff's additional arguments regarding Louisiana Civil Code article 1772 are also not persuasive.  Article 1772 states that a conditional obligation "is regarded as fulfilled when it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment."  La. Civ. Code art. 1772.  The plaintiff cites to a number of cases applying Article 1772 purporting to support his position. Unfortunately for the plaintiff, each of these cases is factually distinguishable from the present case.

Plaintiff first cites to Bloom's, Inc. v. Performance Fuels, L.L.C., 16 So. 3d 476 (La. App. 2d Cir. 2009).  In Bloom's, the plaintiff landowner initially sued the defendant to terminate their lease.  Before trial, the plaintiff and defendant executed a "Letter Agreement" wherein the defendant agreed to purchase certain land, including the disputed property, from the plaintiff.  See id. at 478.  The Letter Agreement was conditional "upon the execution of a Buy-Sell Agreement by both parties and the closing of the sale occurring on or before May 1, 2008."  Id.  The defendant prepared a Buy-Sell Agreement (which contained the same suspensive conditions mentioned above) and sent it to the plaintiff, who signed it and returned it to the defendant.  The defendant ultimately never signed the Buy-Sell Agreement, so the plaintiff sued the defendant seeking to enforce the Letter Agreement.  See id.

13

at 478-79.

The court in Bloom's ultimately found for the plaintiff and ordered specific performance, requiring the defendant to purchase the property. See id. at 481-82. Moreover, the court applied Article 1772 to deem certain suspensive conditions in the Letter Agreement fulfilled. See id. The plaintiff argues that this court should similarly apply Article 1772 to deem the suspensive condition at issue (executing a mutually agreeable lease form) fulfilled. However, Bloom's is distinguishable for two reasons. First, the court in Bloom's did not deem the suspensive condition of executing the Buy-Sell Agreement fulfilled but rather addressed two separate conditions–the defendant obtaining a title opinion and survey on the property. See id. at 481. Second, the court in Bloom's found that the Letter Agreement constituted a valid settlement agreement under Louisiana law. See id. at 479. In contrast, the plaintiff here is asking the court to use Article 1772 to deem that a binding agreement existed between the parties. This would be an inappropriate use of Article 1772.

Next, the plaintiff cites to Grimsley v. Lenox, 643 So. 2d 203 (La. App. 3d Cir. 1994). In Grimsley, the defendants entered into a buy/sell agreement to buy the plaintiff's home, conditional on the defendants obtaining a loan within twenty-one days of the agreement being executed. See id. at 204. The defendants' loan application was denied because of an undisclosed student loan judgment against the

14

wife.  See id. at 204-05.  The court applied Article 1772, finding that the non-disclosure of the student loan judgment constituted bad faith and the defendants were thus estopped from claiming the buy/sell agreement was null due to non-fulfillment of a suspensive condition.  See id. at 205-06.

Like the Bloom's decision, Grimsley is distinguishable from the present case.  The Grimsley defendants put false information (either knowingly or inadvertently) on their loan application when they stated there were not any outstanding judgments against them, which led directly to the non-fulfillment of the suspensive condition of obtaining a loan.  See id. at 205.  In contrast, the suspensive condition at issue in this case was the execution of a mutually agreeable lease form.  Chesapeake did not submit any false information or do anything that led directly to the parties not being able to come to terms on a lease form.  Rather, Chesapeake decided it no longer wanted to come to an agreement, which it had every right to do because the LOI was not binding.

Finally, the plaintiff cites to Schollian v. Ullo, 558 So. 2d 776 (La. App. 5th Cir. 1990).  In Schollian, the plaintiffs entered into a purchase agreement on August 9, 1986, to buy property from the defendant.  See id. at 777.  The agreement was subject to a number of suspensive conditions, including the plaintiffs being able to obtain a loan at least ninety days before August 31, 1987, and that the property

appraise for at least the sales price of $145,000. The plaintiffs did not apply for a loan until July 31, 1987, and withdrew it before it could be denied. Additionally, the property was appraised on August 24, 1987, for only $131,500, due to "sluggish" economic conditions and "an over supply of housing." Id. at 778. The court ultimately held the plaintiffs liable for breach of contract, applying Article 1772 to deem the agreement was binding despite the plaintiffs failing to obtain a loan and the property not appraising for the sales price. See id. at 780.

As with the prior two cases and for similar reasons, Schollian is distinguishable from the present case. The Schollian plaintiffs delayed their loan application and appraisal for eleven months, which ultimately caused both suspensive conditions to fail. Here, Chesapeake withdrew its offer only one month after the LOI was executed. During that time, Chesapeake had a number of internal discussions about both the proposed lease form and whether the deal made financial sense for the company. Chesapeake did nothing to thwart or sabotage the suspensive condition of the parties agreeing on a lease form; rather, Chesapeake merely decided to withdraw its offer.

The plaintiff would have this court apply Article 1772 in a way that would transform a non-binding letter of intent into a binding contract. Such a decision would effectively vitiate Article 2670, which allows parties to delay being bound by

16

a preliminary agreement until certain conditions are fulfilled.  The court will not apply Article 1772 to deem that a binding agreement existed.  The court instead is bound to apply the law as written, and therefore finds there was not a binding agreement between the parties.

### 2.    Breach Of The Duty Of Good Faith.

In addition to his breach of contract claims, the plaintiff also argues that Chesapeake breached its duty of good faith when it backed out of the deal. Specifically, the plaintiff claims that Chesapeake breached the duty of good faith because it failed "to diligently pursue the closing of the mineral leases."  Record Documents 26 and 28.  Chesapeake defends itself on the ground that the duty of good faith does not apply because no binding agreement ever existed.  See Record Document 29.

The duty of good faith is imposed in Louisiana Civil Code article 1759, which states: "Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation."    In his opposition to both the motion for summary judgment and the motion for sanctions, the plaintiff cites to two primary cases in making his arguments about good faith—Bloom's and Retail Merchants Association, Inc. v. Forrester, 114 So. 3d 1175 (La. App. 2d Cir. 2013).

As previously mentioned, in Bloom's the plaintiff and defendant executed a

17

"Letter Agreement" wherein the defendant agreed to purchase certain land, including the disputed property, from the plaintiff. See Bloom's, 16 So. 3d at 478. The court in Bloom's ultimately found for the plaintiff and ordered specific performance, requiring the defendant to purchase the property. See id. at 481-82. Moreover, the court applied Article 1772 to deem certain suspensive conditions in the Letter Agreement fulfilled. See id.

In Forrester, the defendant received treatment from a hospital. At the time of admission, the defendant submitted his insurance information and signed a contract stating that, among other things, the defendant would pay any remaining balance that his insurance did not pay for. See Forrester, 114 So. 3d at 1178-79. This contract further stated that the hospital "will" file a claim for payment with the defendant's insurer. However, the hospital did not file a claim with the defendant's insurer and did not demand payment from the defendant until almost two years later. The defendant's insurer refused to pay claims more than one year after services were provided. A credit agency, on behalf of the hospital, sued the defendant to recover payment for the services. See id. at 1176-79. The court found the plaintiff was estopped from bringing a claim against the defendant for the debt. Specifically, it found that the hospital had a duty under the contract to submit a claim to the defendant's insurer and, having failed to fulfill its obligation, the hospital could not

18

now seek to enforce the reciprocal obligation against the defendant to pay. See id. at 1180.

The plaintiff's reliance on these cases is misplaced because both are factually distinguishable from the present case. Specifically, in both cases there was a binding contract between the parties. In Bloom's, the parties had signed a settlement agreement. See Bloom's, 16 So. 3d at 479-80. In Forrester, the defendant signed a contract upon admission to a hospital in order to receive treatment which bound the defendant to pay for the treatment if his insurer failed to do so. See Forrester, 114 So. 3d at 1178-79.

A more relevant case, cited in Chesapeake's motion for summary judgment, is Liljeberg v. Hospital Corporation Of America, Nos. 87-4295, 81-4717, 83-3031, 1989 WL 30272 (E.D. La. Mar. 28, 1989). In Liljeberg, the parties executed a letter of intent and were negotiating a final agreement, but failed to execute the final agreement. In granting partial summary judgment and dismissing the plaintiff's claims relying on the letter of intent, the court observed that "the letter [of intent] was not a contract, however, the Court concludes the good faith of the [defendants] was irrelevant: **There is no contract or legally binding obligation on which to impose a duty to act in good faith . . . .**" Id. at 4 (emphasis added). While the court later observed that the defendants arguably had not acted in what would be considered

19

good faith, "this conclusion does not prevent the entry of summary judgment in movants' favor because the Court has concluded no contract existed in the first instance." Id. at 5. See also Favrot v. Favrot, 68 So. 3d 1099, 1109 (La. App. 4th Cir. 2011)("[W]e do not examine a party's good faith (or bad faith) *unless and until* we find that the party has failed to perform an obligation, from which the obligee has sustained damages.") (emphasis in original). Having already determined that no binding contract existed between Chesapeake and the plaintiff, Chesapeake did not breach any duty of good faith because no such duty was owed.

The plaintiff's arguments regarding good faith mirror his arguments about Article 1772 and suspensive conditions. Effectively, the plaintiff is asking the court to find that, when two parties sign a non-binding letter of intent subject to executing a final document and that final document is never executed, whichever party backed out of the deal first was necessarily in bad faith. Again, this would vitiate Article 2670, giving every party that enters into any letter of intent in Louisiana the choice of either forming a binding agreement or paying damages for breaching the duty of good faith. The court instead chooses to give effect to the law as written and finds that Chesapeake did not breach the duty of good faith because there was not a binding obligation between the parties.

### 3.    Motion For Sanctions.

Chesapeake's motion for sanctions seeks dismissal of the plaintiff's action as well as fees and costs incurred in pursuing the motions filed by Chesapeake.  In light of the court's ruling on Chesapeake's motion for summary judgment, the portion of Chesapeake's motion for sanctions that seeks dismissal is moot.  As to Chesapeake's request for fees and costs, the court finds that Chesapeake's motion should be denied.

The two cases cited by Chesapeake in support of its request for fees and costs are easily distinguished from the present case.  In Carman v. Treat, 7 F.3d 1379 (8th Cir. 1993), the plaintiff filed a civil rights action against two Kansas City police officers, alleging they assaulted him when transporting him to the Jefferson City Correctional Center ("JCCC").  The plaintiff subsequently filed for a temporary restraining order, alleging that JCCC employees retaliated against him for filing his civil rights action by "beating him, threatening him, withdrawing his earned-time credits, depriving him of medical care and clothing, confining him in a punitive segregation cell, and lengthening his prison term."  Id. at 1380-81.  The defendants responded that they did not have any control over the plaintiff's conditions of confinement at JCCC and requested sanctions against the plaintiff.  The court granted the request for sanctions, dismissing the plaintiff's complaint.  See id. at 1381.

Chesapeake also cites to Brown v. Ameriprise Financial Services, Inc., 276

F.R.D. 599 (D. Minn. 2011). In <u>Brown</u>, the plaintiff brought a putative class action against her former employer, Ameriprise, alleging discrimination against herself and over 1,000 African-American employees. During the course of discovery, Ameriprise learned that the plaintiff had copied most of her allegations, including specific employment practices and policies that were not applicable to Ameriprise, from a complaint filed in another court against a different company over a decade earlier. See <u>id.</u> at 601-02. Ameriprise filed a Rule 11 motion seeking sanctions, including dismissal. The court granted Ameriprise's motion and dismissed the plaintiff's complaint. See <u>id.</u>

Both <u>Carman</u> and <u>Brown</u> are distinguishable from the present case. The plaintiff in <u>Carman</u> tried to attribute liability to the defendants for the actions of non-parties over which they had no control. See <u>Carman</u>, 7 F.3d at 1380-81. As for <u>Brown</u>, sanctions were merited there because the plaintiff merely copied verbatim a complaint "against a different defendant, in a different court, in a different industry, for conduct occurring in a different decade," and adopted those claims as her own without any hope of evidentiary support. <u>Brown,</u> 276 F.R.D. at 605. In contrast, Chesapeake and the plaintiff merely disagree about what the relevant facts are and how those facts should be interpreted and applied. Although the plaintiff may be asserting essentially the same claims that were asserted in the <u>Walsworth</u> action in

22

state court, this is not comparable to the conduct of the plaintiff in <u>Brown</u>.

While Chesapeake appears to argue that the plaintiff filed the present complaint in bad faith, this court's inquiry is an objective one. <u>See</u> <u>Jennings v. Joshua Indep.</u> <u>Sch. Dist.</u>, 948 F.2d 194, 197 (5th Cir. 1991). Although the court is granting Chesapeake's motion for summary judgment, that does not necessitate a finding that the plaintiff's complaint was not objectively reasonable. Therefore, Chesapeake's motion for sanctions is **DENIED.**

### III. CONCLUSION

Chesapeake has established that there are no genuine issues of fact that Chesapeake and Graham signed a non-binding letter of intent subject to executing a mutually agreeable lease form, which was not done before Chesapeake withdrew its offer. Therefore, Chesapeake's motion for summary judgment is **GRANTED** and Graham's claims are **DISMISSED WITH PREJUDICE.** In light of the court's ruling on the motion for summary judgment and for the further reasons discussed herein, Chesapeake's motion for sanctions is **DENIED.**

A judgment consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DATED AND SIGNED** at Shreveport, Louisiana this 16th day of

October, 2013.

_____
JUDGE TOM STAGG

24